Your Honor, the first case of the afternoon is Session 209-165, People of the State of Illinois v. Jerry L. Lee. On behalf of the Appellant, Mr. John Yetter. On behalf of the Athlete, Mr. Richard Monk. Gentlemen, are you both ready to proceed? Yes, Your Honor. You may proceed as ready. Good afternoon. Again, John Yetter on behalf of Mr. Lee. Your Honor, Your Honors. We present in our brief in an argument three issues on appeal. First, that it was an error not to give the involuntary manslaughter instruction in this case. Second, that it was an error to exclude certain evidence of aggressive and violent behavior on the part of both the victim and the others who were in the vehicle at the time. And third, that the State failed to prove the unreasonable doubt the defendant did not act in self-defense. As to the first issue on appeal, clearly the jury felt that the defendant's state of mind was at issue here. An instruction for second degree was given to them, and that was their finding. The defendant having been charged with first degree murder, the lesser included second degree having been given, that was the verdict of the jury. The question is whether or not Mr. Lee's behavior was reckless as defined by the statute. And that, did it disregard or constitute the gross deviation from the standard of care a reasonable person would exercise in that particular situation. Mr. Yetter, could I just ask? Sure. Did the defense ask for the second degree murder instruction? Yes, Your Honor. They asked for both second degree and for the involuntary manslaughter instruction. Second degree was given. Involuntary was denied by the appellate court. As a matter of law, aren't the mental states inconsistent? Second degree is inconsistent with the reckless state of mind required for involuntary. Don't you have to pick a theory? I don't believe you have to choose one or the other. I believe that it could be argued that they could not both be found. But in terms of actually giving instruction, I'm unaware at this point of any case law which precludes the giving of both instructions. I'm just talking from a theory standpoint. As a matter of law, they're inconsistent, correct? Not always. In the sense that, specifically, People v. Witters states that self-defense does not preclude involuntary manslaughter. And you could certainly argue that the mental states are different for those two. But it doesn't preclude them being given at the same time. In fact, the defendant in this case was consistent both in his testimony and trial and in the statements he gave leading up to trial as to the fact that it was not his intent to kill anyone. I'm sorry. I'm terrible at names sometimes. And at that time, as we've put in the brief, he indicated that all he was doing was trying to frighten them. That goes entirely, as does the entire defense. It's the defendant's state of mind. In fact, all three parts of the appeal and the defense of trial center entirely on the defendant's state of mind. In fact, much of the prosecution did, too. They presented expert testimony that the cause or the mental state of the defendant at the time or the reasoning behind the shooting was gang affiliation. How does people versus SIPP differ from your case? And why should we deviate from the whole SIPP on the involuntary manslaughter issue? The issue in SIPP, which I know is the primary reliance of the circuit court in this case, the decision they quoted it, they referred to it as almost factually the same. I forget exactly what their words were, but that was certainly their meaning of it. But there's a primary factual difference between Mr. Lee's case and the SIPP case. The factual difference being in SIPP, the defendant knew of an assault on his daughter, or a threat to his daughter, I'm sorry. Thereafter, went out and acquired a handgun and went specifically looking for the person he happened to at that time found the victim, the defense, in a crowd and fired into a crowd. And there's some argument to be made about whether that constitutes simply reckless robbery. But it is the intent in that case that he went looking for a gun and went looking for the person. This is similar because this defendant went looking for a gun to allegedly protect himself against Rubio and some Latin kingers. That's correct. He did. In fact, the difference between the primary difference being he didn't go looking for them. They found him. And I believe in my mind that is a large distinction between the two cases actively seeking out the victim of case versus. I believe Mr. Lee's testimony was that he had acquired a gun and had roughly not left home without it for a month because he was afraid specifically of these people. But he never in that month went looking for that. And the evidence shows that he told his sister that he paraphrased that they wasn't going to take this anymore, referring to the activities of Rubio and his associates. I believe that's correct. He was clearly frightened. The difference in my mind, and I believe it's very distinct from case law, is that in SIP, SIP went looking specifically for that person. And in this case, my client was out. I guess you'd say minding his own business, but they saw him. He was on a bike. They were in a car. They came after him. Got in front of him, got out. Throughout trial, they insisted that they had stopped to change seats until the very end. And Mr. Conchola, in his testimony, finally said, no, we were getting out to fight, which is clearly the truth of the matter. They were blocks from their ultimate destination. And the assertion that they stopped to change seats, blocks from their ultimate destination, right in front of Mr. Lee, kind of defies common sense. In fact, with SIP, that was the case. It's not a race, though. It's the factual issues, too. And it's completely understandable, and I was going to raise the point myself, because the circuit court relied heavily on the decision in SIP. And I believe that it was inerrant to do so. This case is more factually similar to some of the other cases that we cited. In the case of Williams and Witters, in Witters, the defendant claimed that she had stabbed the victim in self-defense, not to kill him. The jury convicted her of voluntary manslaughter. The Illinois Supreme Court concluded that the record contained evidence of defendant's actions, which, if believed, the jury could constitute reckless conduct. So, to Justice Burkett's question, at that time, also, the state of mind could have gone either way. Ultimately, the state of mind of the defendant, which is the primary issue in these defenses, is the purview of the jury. That is simply our point. The jury clearly had questions about the defendant's state of mind. Do you think that the state of Illinois and why is that? If you point a gun at somebody in the evening, though you don't intend to shoot them, but do shoot in their direction, is that you're not entitled to an involuntary instruction? I believe that that describes something of a... I believe that takes away the question of mental state in a way that the law in Illinois doesn't allow for right now. The killing was for, to get the instruction, the charge, it must be an involuntary killing. Which is the intent of the shooter, for lack of a better expression. Again, throughout the entire trial, I believe that the only real issue here, Mr. Lee never denied that he pulled the gun and that he fired it. I said it about unintentional. Well, again, Mr. Lee never denied what he did in terms of physically. The question throughout the trial, and for, and not, is why did he do it or what did he intend when he did it? That is a purview for the jury. And I think that when a jury has shown you that they have some questions about what it was that the defendant was thinking, which they have in this case, that it's there to limit their ultimate choices. The jury clearly found that Mr. Lee knew the consequences of his actions, that he had at least had knowledge that he knew firing the gun. He fired it multiple times in the direction of other people. The jury found beyond a reasonable doubt that he knew what he was doing, but they found that he believed he was acting in self-defense, but his belief was unreasonable. I mean, that's what the jury found, correct? I'm always hesitant to say exactly what a jury has found, but ultimately, legally, that's legally what they found. Wasn't he charged also with intent? He was charged first. In other words, for purposes of the homicide, he was charged with intent and knowing. Yes. Yes, I'm sorry, I had to think back, because three counts were dismissed immediately prior to trial, but yes. When the defendant was convicted on second, they could find either the intent or the knowing, and is there anything in the record to show that they found intent or knowingly? Because they had to find homicide before they could take the next step with respect to second-degree murder. They had to find either, they had to find the first-degree murder by intent or knowledge for purposes of finding second-degree murder, because they have to make that finding before they got to the next finding, which is serious provocation. That's correct, and I, forgive me, I don't have the note right in front of me of which verdict forms were, in fact, signed. Although, they don't necessarily have to find yes on first-degree, and then we back off of it. They have to find that he intentionally fired the weapon for finding a second-degree. They're instructed that they have to find, as I recall, they have to find either first-degree murder, either intent or knowing, before they can get into the next issue of discussing second-degree murder. They have to find the first-degree murder before they can go on and consider second-degree. That's correct. They don't have to do an actual verdict form as to it. They just have to make a finding. Right. The finding is implicit in the verdict form that they sign. The second-degree instruction, I think the second-degree instruction tells them they must find murder before they can find second-degree with the additional element. That's correct. My point is that they make a finding, and then after they make the finding, they essentially examine the defendant's mental state. What was his intent? What they've said, what they've shown us in signing second-degree is that they have made a decision about the intent. The question is, how far would they have gone to it? If they had an instruction for involuntary, could they have signed it? None of us standing here today know that, but the possibility remains that they could have. We don't know the depths to which they would have plumbed his mental state and come up with that. That's somewhat hindsight. I'm just trying to clarify, Justice Lipson, for Kev's question regarding the knowingly part. There's no question in the record anywhere that Mr. Lee knowingly discharged the firearm towards the vehicle. That is his word at trial. His testimony was he pulled out the gun. He fired, I believe he said four times, started firing low bullets. The gun fire traveled up. What's the testimony that the only bullet hole found in the car was in the post between the front seat and the back seat? I'm sorry, I don't recall. There might have been one in the back of the vehicle also. In terms of being in the bumper or the— The only one that went into the—there was one that went into the passenger compartment, that I'm sure of. But I don't recall the exact testimony as to the travel. I know that there were four shots fired and ultimately one entered the passenger compartment of the vehicle. The second primary issue then, of course, goes again to evidence regarding the defendant's mental state. Clearly, defendant's mental state is in play here. The jury has shown us that, again, in hindsight. They've shown us that they were at least considering it to some point. There are two ways, essentially, to be able to enter evidence regarding the character of a victim in a case. One being for the purpose of the defendant's knowledge at the time of the event. The second being the defendant's propensity to violence makes it more likely that he was the aggressor. In this case, primarily we're dealing with the first issue. What was known to the defendant at the time of the occurrence, not so much to prove that Rubio was the aggressor. In fact, the evidence shows that it was Rubio's companions, ultimately, who were all out of the car. Or who were out of the car, not Rubio himself. There were essentially four issues in a motion in which the defense wished to bring in at trial. Regarding what was known to the defendant at the time of the shooting. And one was a potential testimony of Chad Presswood, the companion, compatriot of Mr. Lee, who had been shot by a member of the victim's gang in the back the previous summer. Mr. Lee's position. Just to make it short, isn't it, the judge's use of discretionary decision and allowing evidence. Do you agree with that? Yes. And wouldn't that bring in a lot of other factors, outside factors as to circumstances of why he was shot, etc., etc.? And in balancing the evidence already in the record relative to what the defendant knew about the five in the car. That arguably it was not an abuse of discretion. With respect to the two teachers, their testimony is from a video. Would it be an abuse of discretion if the judge says, I'm not going to let it in, and now it comes from videotape to videotape. Sign it in evidence. What else do you have? Let me take Mr. Presswood's testimony. Okay. The state at the trial court level, and in fact, the state in their brief here, posited several scenarios in which the defendant could have, the list included, gone to the fire department, called the parent, run away, do all of these things. All self-defense cases are wrought with what-ifs, every single one of them. And if we limited, if we can't allow every what-if and we can't limit every what-if, because they are factually specific to each case, and I understand that's why we have the balancing test. But to argue, as they did there and as they did in the brief, that he could have done any particular thing, the defendant then has to be allowed to counter-argue. Take Mr. Presswood. Mr. Lee specifically knew of an incident in which a member of this gang had shot someone in the back running away. So then to say, well, he could have run away or he could have done this, again, it's what's in the defendant's mind. It's the first part of that test. What does he know at the time of the occurrence? And he knew that Mr. Presswood turned around and ran away and got shot in the back. In any given balancing test, I view that as important, certainly to counter the what-if arguments. What if he had done this? What if he had done that? He didn't do any of those things. We have to deal with what actually happened. But part of dealing with what actually happened is dealing with why it happened. That's, in fact, the only issue in an involuntary or a second-degree or a self-defense. Why didn't he run away? It would not surprise me at all if every juror in every self-defense case sat and, in fact, put themselves in that situation. What would I do? I don't think any of us really ever knows. Mr. Lee was put in a situation where he had to find out what he was going to do. And he processed what information he had at the time and whether his decision was right, wrong, or different. It was the decision made on the information he had at the time. Do you realize you only have 15 minutes? Yes. Have I passed that? Again, I'm not going to get into all of the issues. Obviously, they were in the brief. I would like to indicate, because I think it goes to the balancing test, that the court did allow the state to present an expert that this shooting was gang-related, that the reason it happened was because of a rival gang situation. They put in the evidence of Detective Montague Hall to testify that. So to say that we're going to put an expert on to say what it was but then disallow the defendant from saying, no, this is what I was thinking at the time. Ultimately, with one exception, all the members of the people that were in that car survived, denied being a member of a gang at all. Although it came out through Detective Hall that they were, or at least that the police believed them to be. So again, if we're going to balance this, we have to give the defendant enough room to argue what was completely in his state of mind. Despite whatever evidentiary problems are with the video, I understand. But specifically to Mr. Presswood, that was in his mind. Mr. Yetter, your time is long up, so you'll have an opportunity for rebuttal. Thank you. May it please the court, counsel, Richard Lunder on behalf of the people. Your honors, the trial court below, when discussing SIPP, did not suggest that the facts were similar relating to the search or lack thereof of the victim in SIPP to the circumstances in this case. The court said the facts were substantially similar relating to the actual shooting once the defendant was at the scene and the actions and comments that were made. I.e. that there wasn't evidence defendant in SIPP. Similarly to the case at Barr, defendants and while I was shooting off to the right, I was doing it to scare. I wasn't intended to kill anybody. Wasn't that SIPP's testimony? Yeah, I was suggesting SIPP and I'm saying exactly. No, in SIPP, that was SIPP's testimony. We have almost the identical facts in this case as the trial court said. The searching out in SIPP or lack thereof. What about the issue raised by Appelheim that in SIPP, the defendant specifically went looking for the victim and found the victim and shot the victim. With the same additional line, I didn't intend to shoot or kill anybody. That would relate to the self-defense and or voluntary aspect. It doesn't relate to the issue or the legality of involuntary or the ability to receive an involuntary instruction. Again, the court was very specific below saying, I'm not looking at the searching out or lack thereof. I'm saying once on the scene, what actions were taken? I believe it lacks any relevance to the issue of whether he should have received an involuntary instruction. It relates strongly to whether or not he should receive an instruction relating to self-defense or voluntary, which he did. Do you agree that if there's some evidence on a particular point, that issue, that the court in general is obligated to give an instruction regarding that particular issue? Generally, yes. The law related to the lesser included instruction of involuntary actually is sort of vague on that. And looking at Sip versus Williams is kind of a good way of analyzing that. Let me mention a couple of other facts that might support involuntary instruction. Regarding Sip, defendant threatened in the past with, I mean, from the standpoint of the defendant's case, the defendant was threatened in the past with drive-by at his home, threatening a beating. He was chased out of the park on numerous occasions. He had a fight with Rubio and other parties in the car. On the bike at the gas station, there was argument and allegedly the flashing of gang signs. The car turned around. The car followed the defendant out of the gas station. And when it got to the bike, it sped up, turned in front of the bike, caused the bike to stop. The car was approximately 15 to 20 feet away at the time the door opened and two of the people in the car started to exit the car. I'm not exactly sure how far they got out of the car. There's conflicting testimony. There was a movement by one of the parties in the car towards his waist that caused the defense some concern that they might be reaching for a weapon. And none of those facts are present in Sip or even close to. Again, Your Honor, I'd answer on a twofold. One, that the people don't believe that any of those facts are relevant to the issue of a lesser-included defense of involuntary. Those are all relevant to the lesser-included defense of voluntary manslaughter. Those all would relate to defendant's reasonable or unreasonable belief in that he needed to do something in self-defense. The issue of involuntary manslaughter, as was asked before, is, the question that was asked, is it, can you receive an involuntary manslaughter instruction if you knowingly, intentionally fire a gun in the direction of the victim? The people would say, that's Sip, and the cases say, no, you can't. Let me ask you this. First of all, just a clarification. In page 15 and 16 of the appellate's brief, you refer to voluntary manslaughter. That's a typo, right? You're talking second-degree murder. Yes. So we're talking about second-degree murder. Yes. How does the defendant's conduct, I'd like you to talk about the definition of knowledge as it relates to the defendant's conduct and the way the jury was instructed. The definition of knowledge. The defendant being a gang member, which came in, and the rival gang, Latin Kings, both violent street gangs, how does the defendant's decision to arm himself in anticipation of the confrontation, how does that relate to his decision-making? And also the issue of mental state. It relates to the justification, or lack thereof, of a concern or a need for self-defense. Did the state argue that the defendant was the initial aggressor by arming himself? Indirectly, yeah. The people's position was defendant had been pursued for a length of time. There had been a number of altercations. There had been many incidents. There certainly was testimony, as Justice Bowman has suggested, that there were drive-by defendant's house with shouting of gang slogans. There were prior incidents, which, again, I want to emphasize, there's no evidence in the prior direct altercations of who was the instigator. We have evidence of fights. We don't have evidence that defendant didn't instigate them. Even the incidents at school, it was fights. It was not defendant alone against multiple victims and Rubio and other people. It was defendant and at least a couple of friends against Rubio and some friends. So those all relate to defendant's state of mind as far as whether or not he should obtain a gun and whether or not he needed to take some action. The question is on the night of the, and then the people's position was, well, wait a second. He defined, he did testify to his intent. What was his intent? His intent was, I'm not going to take this anymore. Let's make it clear. There are, there's testimony relating to gang activity and that defendant was a gang member or, more specifically, probably a gang associate. There was testimony that at least one or two of the victims were gang members. For lack of a better term, I would suggest that if these were violent gang members, they were gang-lite. What does that mean? None of these members, defendant has never testified that any of these individuals were ever seen with a weapon. Forget a gun, a knife, a club. He was able to escape from them by his own testimony on numerous occasions when he went to a park and was able to run the two blocks back home. He never said that he had a fear that any of them had weapons. He never stated that anything but fists was used. He never stated that he was actually, despite the threats and the gang slogans, that he was ever beaten. He was a big, strong athlete. He was, I believe, a linebacker and running back of the team. He was a wrestler. He was bigger than Rubio himself. There's not specific testimony in the record relating to his size versus the other individuals in the car. But he was always able to escape. There were no weapons used. And there was no testimony until a car ran across that defendants saw anyone in the car with a weapon. On cross-examination, after he pretty much said, no, I didn't see a weapon, was asked, well, was there any? Well, yeah, I think, for the first time, I think someone might have reached underneath their shirt. But there was no testimony that he saw them with a weapon in that day and time. What there was testimony to was both he and his sister stating, I'm tired of lying. And he testified he obtained a gun two or three months before and pretty much took it anywhere. And he also testified that, let's skip for a moment to the concept of state of mind and Mr. Presswood. The people strongly and adamantly disagree with the defendant's factual presentation. The fact is that defendant is wrong. Presswood was not and could not testify that he was shot by a gang member of defendant's, I'm sorry, victim's gang. There was initially a suggestion that that's what Presswood would testify. The judge specifically stated, if you can give evidence that any of these five individuals or a member of these, of the gang that these five individuals belonged to had done what Presswood had initially stated, i.e., shot Presswood in the back when he ran away, that would be allowed to be presented. I'm sorry I don't have the direct citation, but that record does specifically say that when that motion was either re-raised or continued, defense counsel said, sorry, actually what we now have is, at best, Presswood was told by a third party that a gang member shot him, but he can't, even that third party didn't say what gang that gang member belonged to. Certainly could not say that it was a member of any of the gang the victims belonged to. At that point, at that point only, the trial judge said, I'm not going to allow that in. You can't come in and say, well, Presswood was shot by some unknown individual who may have been a gang member, but not related directly to any of the five victims or even their gang, and then use that allegedly to demonstrate. Isn't the issue, though, what Chad Presswood told the defendant here? Not whether it was true or not? Presswood wouldn't have even stated on the record that that's what he told the defendant. I mean, I guess defendant could have come in and said, well, I was told by somebody, but Presswood, my strong recollection of the second hearing was counsel said, well, Presswood wouldn't even say that. Presswood would not state that he told defendant that he was shot by a member, either one of the five individuals or a member of their gang. There was no question that the court allowed in considerable evidence. Considerable evidence. Actually, of the nine issues raised by defendant as alleged error, the judge allowed the defendant present seven of them. And they chose not to present. Defendant chose to present three of them, chose not for, again, assuming the trial strategy to present four of them, and Presswood being one of them, and did not pursue two others. So of the nine possible issues, the judge was going to allow evidence of the seven. And again, the reason presumably relating specifically to Presswood was trial counsel on further discussion with Presswood apparently found that Presswood wasn't going to say that and wouldn't even be able to say I told defendant that. In addition, the intent or the mindset of defendant is also maligned by the fact that after the time, which is established in the record, and again, I apologize, I don't mean to direct cite, but after Presswood would have told him this information, defendant ran away from the park to his house multiple times. Why is that important? It's important because he did turn his back multiple times and did in each case run away safely and never suggested that anything was thrown at him, much less there was a shot. So the need or the mindset, the defendant's own testimony was that he turned his back multiple times. What was the difference this night? The difference this night was he was now armed and he wasn't going to take it anymore. He was tired of it. We agree with defendant that you have to look or when you're evaluating what possible options are, you do have to take into account what was occurring. How quickly did he have an opportunity? However, we're not suggesting that a lot of his options were available once he was stopped at the location of the car. Please understand that the first altercation that evening, the yelling or gang slogans, was right when defendant was at the gas station. Why didn't he pull out the gun and shoot all five of them when he had them all together in the car? Why did he wait until the five in the car sped up behind him, turned around in front of him and stopped him from going? You're not talking about speculation. I don't know. But the fact is defendant said, I saw the car at the corner of Jackson and Belvedere. That is right where the gas station is. He then claims he saw them make a U-turn on Jackson and come back. He couldn't have been far down Belvedere in order to see that. Yet when they pulled a U-turn and then pulled towards him, again, that would have been north, sorry, west, towards the lake, east, on Belvedere. Yet he continued to ride forward. Now there was some discussion, there was some testimony that his brakes might have been an issue. But again, he proceeded as the car passed. He didn't turn around at that point in time. He proceeded in the same direction as the car. When the car stopped, why did he pull out then? Well, because he had a gun now. And he said, why? He cut him off. No question. Well, didn't say cut him off. It stopped in front of him. His testimony is he didn't have a route of escape. That is not the testimony of the four remaining victims. And two, it is clear from the record that he was somewhere between 200 and 300 feet from the gas station. And again, oh, by the way, a fire station directly across the street from the gas station. So your position is that the trial court's ruling, in spite of the defendant's testimony, was that the trial court's ruling is correct because there's no credible evidence that a plea by a jury would result in an involuntary manslaughter. Unquestionably, and why, you have to look at the second part of Stipp. The second part of Stipp says besides the fact that you knowingly and intentionally fired a gun in the direction, there might be some circumstances. And if you look at the, I'll call it Williams 1, the first Williams, before it was remanded and reversed on a separate issue, there's a discussion of some cases in there, and it shows you some examples of why it might be different even if you shoot in the direction. There's no evidence that the defendant shot at a warning. He didn't shoot. I shot a warning. He didn't shoot in the ear. He didn't testify I shot in the ear, unlike Stipp. He shot directly in the direction. His testimony, again, he said I aimed low. Way up in the air, came down, stuck something in the floor. Again, presumably that is. That's a joke. Oh, it's actually, that was one of the scenarios the people were thinking of as possible. And in Williams 1, there is a case where there's a ricochet. There's another case where the testimony of the forensic scientist said that if you literally aimed the gun from eight feet away, they did this test, aimed the gun directly at the individual. I apologize. It's okay. If you aimed the gun directly at the individual from eight feet away, the gun, the rifling of the barrel was so bad, you actually wouldn't hit the person. It would shoot off to the side. Those are the kinds of circumstances where they say you can fire in the direction, but there might be an additional factor that would still grant an involuntary. In Stipp, the court said, wait a second. Forget the fact that we don't accept a defendant's comments directly. Not to say we never can, but we have to have an additional fact. And in Stipp, they said the fact that two of six bullets hit a human target belies any other fact and belies defendant's claim. In our case, what do we have? We don't have one bullet, which scenario thing, yeah, you could shoot in the air like an arrow. Arguably speaking, there could be a bizarre occurrence of fakes that it comes down and hit. But that would show by the forensic evidence. In our case, we had three bullets. There's a dispute. Defendant claims he shot four bullets. But he also says the gun was loaded, which would hold six. And he fired all of them. So we're not sure if there were four or six bullets shot. But out of those four to six bullets, three of them hit a human target. Two of them struck Adam Rubio in the head and neck. So again, you're not talking about shooting off. You're talking about pretty much shooting directly on because he's sitting in the car. And interestingly enough, two of those three bullets didn't hit the people that were charging at the defendant or allegedly charging at the defendant, disputed whether that occurred or not. Two of the three bullets hit his arch rival, Rubio, who happened to be sitting in the car. So strangely enough, for something that wasn't directed, it hit the person behind the allegedly charging individuals. The fact is, defendant specifically stated that, one, he had aim and that he started shooting at their direction. That I do have a cite for. I believe it's on 1410 and 11. So he said, I had aim. I shot at their direction. I'm presuming that that means in their direction. He also then stated, well, I shot low. But again, that statement is belied by the fact that three of the shots, three of the four, potentially three of the six, hit a target. That's pretty good shooting, even for someone on a range. Well, isn't the fact that the barrel in the gun, the grooves were so bad that it supports the wound? No, that was not in this case, Your Honor. That was not in this case. I apologize. I was citing the types. That was in a separate case. One of the cases cited were Williams. And I was giving that as possible examples. Counsel, if you'd like to wrap up your points. Your Honor, for these reasons, we suggest the judge did not abuse his discretion. The judge correctly determined that both the evidence that was presented was appropriate. The evidence that was not allowed to be presented was properly disallowed. And more importantly, that the defendant was not entitled to an involuntary manslaughter instruction in this case. Thank you. Mr. Yatter? I'd just like to touch on a few things that were brought up. Counsel is correct. There's no evidence in the record as to who instigated any specific fight which occurred prior to this incident, the ones at the school. We know that they happened. We know from the record that the defendant was, in fact, told by an officer, by someone at the school, you should transfer schools because you're not safe here. That we know. We know that the defendant did not instigate the drive-bys of his house where he was threatened. We know all of those things. When you're examining a case for a defendant's mental state, as much information as possible, as reasonable, can be given to determine that. We don't ever really know what any particular person is thinking at any particular point. We take circumstantial evidence and we analyze it and grind it up and divine what we believe, as a juror, what we believe the mental state of any given person to be. I have a question regarding the last point. The state did not prove beyond a reasonable doubt that Lee did not act in self-defense. I'd like to hear your argument regarding that. What is your argument regarding that? Is it reasonable for a person who has been the victim of gang intimidation to arm himself or herself and, regardless of what precipitated the hatred between these groups, to arm himself with a loaded firearm and go anywhere in the community in anticipation and then use the gun? Because that's what you're really arguing, isn't it? For us to find that the state failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, won't we have to find that? That that is reasonable behavior? Not societally. I mean, clearly. In this case, that the defendant's decisions to arm himself with a loaded firearm and be out in the night on a bicycle, not knowing when this inevitable confrontation is going to occur, that he arms himself with a loaded gun in anticipation of that event so he can discharge the weapon at those individuals? That's your argument. It essentially is that it was reasonable for him to do that given all of the circumstances, which is why the trier fact needed all the circumstances. You're talking about a situation in which one of the detectives who testified at this trial, at trial, said he would not go into that neighborhood without a loaded firearm. One of the detectives said it. Isn't one of the possibilities just bringing the gun out and pointing it in the direction of somebody would cause that person to stop right on the spot if they didn't have an equal weapon? Certainly. Just because you're carrying a gun doesn't mean you're going to shoot a gun. It doesn't mean you intend to shoot a gun. It doesn't mean you intend to kill anybody that confronts you. And I understand that completely. That's a question of the fact finder. Correct. And as I stated before, any self-defense case, any involuntary case, is rife with what ifs. Every single one of them. What if I did this? What if I went to the fire department? What if I ran away? You know, to say Mr. Lee is a large person, largely, there were five of them. Okay? I'm a large person. Five people come at me. That's not fair. Any five people. What's the standard of review we use in reviewing whether or not the state proved no one was self-defense? Whether there was a limit to the state's self-defense. That the evidence is so improbable or unsatisfactory it creates reasonable doubt of the defendant's guilt. I believe that's what the people versus shots said. Those people versus Collins applied to the state's people? I believe that Collins was limited only to a specific point in the trial. If I remember correctly, I may not. Okay. That Collins referred to a motion for directive finding. Collins' case says that in viewing whether or not a defendant was proven guilty beyond reasonable doubt, or the state then spurred on a proof as to the issues, that you view the evidence of the like most favorable to the state. That is correct. My recollection of Collins was that it was... My question was, does Collins also apply to whatever the burden has regarding proof of self-defense? I'm afraid I can't answer that. I really, I'm not familiar enough with Collins to speak as to what it said right at this moment. Mr. Yoder, any final comments? I just wanted to address one thing that was brought up in the state's argument regarding whether or not Mr. Lee believed that any of the people in the car were armed. There was extensive testimony about what he knew to be the habits of the Latin kings, which played into his state of mind at the time of the incident, that when they believe the quote was rolled five deep, they did so armed. There were several pieces of testimony. I don't have a citation right in front of me, but I know that that's in the record. And again, it's what's in the defendant's mind. So whether or not, whatever the testimony was regarding what he saw at that particular time, his beliefs based on his history, which are on record, would indicate that he had every reason to believe that they were armed. Thank you very much. We will be at recess, and the decision will follow in due time. Thank you.